IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BEL AIR PLAZA LIMITED PARTNERSHIP :
:
:
v. : Civil No. CCB-14-2533
:
:
ROSS DRESS FOR LESS, INC. :
:

## MEMORANDUM

This dispute arises from water damage in a store leased by Ross Dress for Less, Inc. ("Ross") from Bel Air Plaza Limited Partnership ("Bel Air"). Bel Air filed a declaratory judgment action in the Circuit Court for Harford County, Maryland. (Compl., ECF No. 2). Ross timely removed the suit to this court and filed a counterclaim. (Answer & Countercl., ECF No. 7). Pending before the court is Bel Air's motion for summary judgment on its declaratory judgment action and Ross's counterclaim. (Mot. Summ. J., ECF No. 13). Ross opposed this motion, requested additional discovery, and moved to extend the dispositive motions deadline. (Opp'n Mot. Summ. J., ECF No. 19; Mot. Extend Dispositive Mots. Deadline, ECF No. 22). The court finds oral argument unnecessary to resolve the issues. *See* Local R. 105.6 (D. Md. 2014). For the reasons outlined below, Bel Air's motion for summary judgment will be granted, and Ross's motion for an extension of the dispositive motions deadline will be denied.

### BACKGROUND

Ross entered into a lease with Bel Air, effective November 22, 2002, for a retail space ("the store") in Bel Air Plaza, a shopping center located in Harford County, Maryland. (Mot. Summ. J., Ex. A, Lease 1 § 1.1, ECF No. 13-3). In 2003, Ross hired a contractor to install

1

Azrock Vinyl Composition Tile ("VCT flooring") on top of the store's existing concrete floor slabs.  (Mot. Summ. J., Ex. E, Construction Plans, ECF No. 13-7).

*Ross's Construction Plans*

Ross's construction plans instructed the contractor to seal the floor slabs with a moisture control system prior to installing the VCT flooring:

> NEW CONCRETE IS TO BE SEALED WITH CRETESEAL CS2000 SEALER (10 YR. WARRANTY) APPLIED IN ACCORDANCE WITH MANUFACTURERS INSTRUCTIONS.  THE CS2000 2 DAY SYSTEM IS TO BE USED ON EXISTING SLABS WITH PRIOR CONTAMINATES, RESIDUES AND OTHER DEFECTS THAT MAKE IT UNSUITABLE FOR TILE APPLICATION.  FURTHER, SLABS MUST BE DESIGNED AND PREPARED TO TEST AND MAINTAIN MOISTURE VAPOR EMISSIONS AT OR BELOW 3-LBS PER 1000 SF PER 24-HRS USING THE CALCIUM CHLORIDE METHOD.

(Construction Plans, ECF No. 13-7)  The plans also instructed the contractor to "follow [the] Azrock installation manual" when installing the VCT flooring.  *Id.*  The Azrock manual provided, in relevant part, "[a]ny surface materials such as . . . adhesive residues, etc., must be removed." (Mot. Summ. J., Ex. F, Azrock Manual, ECF No. 13-8).

*Lease Obligations*

Ross and Bel Air's respective maintenance and repair obligations are laid out in Article 11 of the lease.   Under this Article, Bel Air has the following responsibilities:

> Landlord shall, at its sole cost and expense (not passed through to Tenant as a Common Area Charge), be responsible for correcting all defects in Landlord's (or Landlord's contractor's) construction of the Store.  Further, Landlord, at Landlord's sole cost and expense (not passed through to Tenant as a Common Area Charge) shall maintain, repair and replace, in good and sightly condition consistent with other similar shopping centers in the Baltimore, Maryland metropolitan area, the foundation, floor slab, [and] flooring (to the extent damaged by slab movement or roof leaking) . . . .

(Lease 39 § 11.2.1, ECF No. 13-3).

Further, the lease provides that Bel Air "shall maintain and repair any damage or defects in any part of the Store caused by the acts or omissions of Landlord, its agents or contractors (and not caused by the acts or omissions of Tenant, its agents or contractors), regardless of which party has the maintenance obligation under this Article 11." *Id.* Ross is obligated to "maintain the interior of the Store" and must "maintain and repair any damage in any part of the Shopping Center caused by the acts or omissions of Tenant, its agents or contractors (and not caused by the acts or omissions of Landlord, its agents or contractors)." *Id.* § 11.1.

*Moisture Problems*

In October 2013, Ross reported experiencing "moisture problems" with the store's concrete slabs. (Opp'n Mot. Summ. J, Email Correspondence 223, ECF 19-4). Excess moisture emissions from the concrete slabs were allegedly damaging the VCT flooring, causing visible distress and interruption of Ross's commercial activities.

Ross hired an expert, Independent Floor Testing & Inspection ("Independent"), to test the concrete slabs' moisture emissions. *Id.* Ross sent Bel Air the results of Independent's preliminary study on December 9, 2013. *Id.* at 216–21. Subsequently, Bel Air's management conducted its own inspection of the store, rejecting Independent's findings of excessive moisture levels. *Id.* at 205. The two parties exchanged a series of emails debating the extent and nature of the moisture problem, damage to the VCT flooring, and their respective responsibilities under the lease. *Id.* at 190–94.

Unable to reach an agreement, on January 9, 2014, Ross provided formal notice that it believed Bel Air was not fulfilling its maintenance and repair obligations in violation of the lease. (Opp'n Mot. Summ. J, Letter Dated Jan. 9, 2014, ECF 19-11). The parties exchanged additional correspondence disputing the nature of the alleged problem and any liability arising

3

therefrom. (Opp'n Mot. Summ. J, Letters, ECF Nos.19-12 to -15). On May 13, 2014, Bel Air's counsel provided Ross with an outside expert's report, purporting to "completely debunk[]" Ross's allegations and Independent's conclusions. (Opp'n Mot. Summ. J., Letter Dated May 13, 2014, ECF No. 19-15).[1] Ross's counsel responded on June 13, 2014, invoking the mediation provision under section 20.2.2 of the lease and providing a copy of Independent's final report. (Opp'n Mot. Summ. J., Letter Dated June 13, 2014, ECF No. 19-16).

*Experts' Reports*

Both Ross and Bel Air have introduced expert witness reports. Ross's expert, Independent, conducted two studies on moisture emissions at the store. (Mot. Summ. J., Ex. G, Def.'s Expert Disclosure, Ex. A, IFTI Investigation Report, ECF No. 13-9). On both occasions, Independent found the concrete slabs' moisture emissions exceeded the acceptable levels set by Azrock, the VCT flooring manufacturer. Azrock's instructions state, "[m]oisture vapor transmission must not exceed 5 lb/1000 ft$^2$/24 hours." (Azrock Manual, ECF No. 13-8). Independent's testing found moisture emission levels ranging from 2.8 lb/1000 ft$^2$/24 hours to 14.7 lb/1000 ft$^2$/24 hours. (IFTI Investigation Report, ECF No. 13-9 at 16, 31). Independent also cored the concrete slab in three locations, two of which revealed sub-slab plastic sheeting. (IFTI Investigation Report 3, ECF No. 13-9). The report suggested this sheeting was a vapor barrier, and its absence from one of the coring sites indicated that its improper installation contributed to the excess moisture emissions. *Id.* Independent's recommendation for remediating the moisture problem is to employ a "moisture control system." (IFTI Investigation Report, ECF No. 13-9 at 20).

---

[1] This report, by Certified Carpet & Surfaces Inspection Company, was not cited by Bel Air in its motion for summary judgment.

4

Bel Air's expert, George Donnelly, reviewed Independent's reports and conducted a site visit at the store. (Mot. Summ. J., Ex. H, Pl.'s Expert Disclosure, Ex. 1, George Donnelly Report, ECF No. 13-10). Mr. Donnelly opined that "[Independent's] findings are consistent with expectations of any building, anywhere in the United States, that is of similar age and constructed with a slab-on-grade floor." *Id* at 2. At the time the store was constructed in or around 1974, most resilient floor coverings contained asbestos and were held in place with a solvent-based adhesive. *Id*. Higher levels of moisture emissions from slab-on-grade floors did not pose a problem for these resilient floor coverings because the asbestos created permeability, which allowed the moisture emissions to pass through the flooring. *Id*.

Over the following years, asbestos flooring across the country was replaced with safer, highly impermeable alternatives. *Id.* at 4. While there have since been significant changes to the best practices for installing slab-on-grade floor, new products—namely, moisture control systems—emerged to allow for the use of impermeable floor coverings with existing slabs. Mr. Donnelly notes that these products "act as an interface between [older] concrete floor slabs that are passing moisture and floor covering systems unable to tolerate moisture." *Id.* at 5. The construction drawings called for application of such a moisture control system. The Donnelly report concludes by stating the "patching compounds and adhesive residues from previous installations" found during Independent's test suggest the CS2000 2-day moisture control system was never applied to the concrete slab. *Id.* at 5.[2]

*Current Litigation*

Rejecting mediation, Bel Air filed suit in the Circuit Court for Harford County, seeking a declaratory judgment that:

---

[2] While the court provides this summary of Mr. Donnelly's report as background information, it need not and does not rely on the report's conclusions, particularly those regarding the application of the CS2000 system, in ruling on this summary judgment motion.

5

(i)     The Lease is enforceable;

(ii)    That Ross is solely responsible to remediate any and all damage allegedly caused by moisture in the floor slab;

(iii)   That Ross shall pay the entire cost for repairing any and all damage allegedly caused by moisture in the floor slab;

(iv)    That pursuant to Section 20.4.2 of the Lease and Section 3-410 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, Bel Air be awarded its attorneys' fees, costs, and expenses incurred in connection with this case; and

(v)     That Bel Air is entitled to such other and further relief as this Court deems appropriate.

(Compl. 6, ECF No. 2). Ross timely removed the case to this court and filed an answer denying Bel Air's allegations, raising affirmative defenses, and asserting a counterclaim. (Answer & Countercl., ECF No. 7). Count One of the counterclaim alleges breach of contract due to Bel Air's refusal to correct the moisture problems and repair the VCT flooring. *Id.* at 11. Count Two seeks declaratory judgment on the same matters as Bel Air's complaint, substituting Ross as the beneficiary of that judgment. *Id.* at 12. Bel Air filed an answer to Ross's counterclaim, denying its allegations and raising several affirmative defenses. (Pl.'s Answer Countercl., ECF No. 9).

Litigation then proceeded with a discovery deadline of April 3, 2015. (Scheduling Order, ECF No. 12). Bel Air filed its motion for summary judgment on March 18, 2015. (Mot. Summ. J., ECF No. 13). Around this time, Ross requested a Rule 30(b)(6) deposition of Bel Air and a deposition of Bel Air's expert, George Donnelly. (Mot. Compel Deps., ECF No. 14). Bel Air denied this request due to scheduling conflicts. *Id.* Ross filed a motion to compel depositions or

for an extension of time by which to complete discovery, *id.*, which this court denied as moot pending resolution of the motion for summary judgment. (Ct. Order, ECF No. 15). Ross subsequently filed its opposition to the motion for summary judgment, including a request for additional discovery (Opp'n Mot. Summ. J., ECF No. 19). In addition, Ross filed a motion to extend the dispositive motions deadline. (Mot. Extend Dispositive Mots. Deadline, ECF No. 22).

## ANALYSIS

### I. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In cases involving contract disputes, "summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *Washington Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007). The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council*

*of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013). At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and quotation marks omitted).

## II. Damage to the VCT Flooring

### a. *Responsibility Under the Lease*

Both Ross and Bel Air request a declaratory judgment holding the other responsible under the lease for remediating damage caused by moisture in the floor slabs.[3] "Leases are contracts and, as such, are to be construed by application of the well established rules of contract interpretation." *Middlebrook Tech, LLC v. Moore*, 157 Md. App. 40, 65 (2004). "The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law." *Sy-Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163 (2003). "When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Id.* at 167.

Article 11 of the lease clearly allocates the parties' maintenance and repair responsibilities. Ross, under section 11.1, must "maintain the interior of the Store," except for those "interior maintenance obligations" assigned to Bel Air in section 11.2. (Lease 39, ECF No. 13-3). Under section 11.2.1, Bel Air must repair or replace flooring "damaged by slab movement or roof leaking," and in general must "maintain and repair any damage or defects caused by the acts or omissions of [Bel Air], its agents or contractors (and not caused by the acts or omissions of [Ross], its agents or contractors) regardless of which party has the maintenance

---

[3] The lease "shall be construed in accordance with and governed by the laws of the state wherein the Store is located, except as otherwise required by mandatory provisions of law." (Mot. Summ. J., Ex. A, Lease 67 §26.8, ECF No. 13-3). Neither party has disputed this provision. As the store is located in Harford County, Maryland, the laws of the state of Maryland control its interpretation.

obligation under this Article 11." *Id.* at 39–40.  Thus, absent slab movement, roof leaking, or an act or omission attributable to Bel Air, the lease unambiguously assigns Ross the responsibility of maintaining the VCT flooring.

Ross has not alleged, or introduced any evidence to suggest, that the VCT flooring was damaged by slab movement or roof leaking.  Accordingly, to survive Bel Air's motion for summary judgment, Ross must establish a genuine dispute of fact as to whether acts or omissions attributable to Bel Air caused the VCT flooring damage.  Ross's argument, at bottom, posits that Bel Air's failure to adhere to its lease obligations—that is, maintaining good, sightly, and non-defective concrete slabs—caused the excess moisture levels that damaged the VCT flooring.  This argument fails because Ross did not establish that the slabs were not in good and sightly condition compared to similar shopping centers of the same age in the Baltimore area, and therefore, Bel Air had no obligation to remediate the moisture emissions or replace the concrete slabs.

Ross claims "the moisture emissions from the Store's concrete slab exceeded acceptable standards for **any** retail facility," and Bel Air erred in not remediating the emissions (Opp'n Mot. Summ. J. 11, ECF No. 19).  Ross's position erroneously conflates moisture levels that affect the integrity of the concrete slab with those that are unacceptable for direct application of VCT flooring.  Independent's report recognizes this distinction by noting the "moisture conditions exceed industry standards for the moisture sensitive floor finish used (Vinyl Composition Tile)," while also attaching an engineer's report stating "the concrete slab . . . appeared in adequate functional condition." (IFTI Investigation Report, ECF No. 13-9 at 7, 15, 29).  Further, nothing in the lease suggests that Bel Air had an obligation to maintain concrete slabs fit for direct application of VCT flooring. Indeed, the inclusion of a moisture control system in Ross's

construction plans, and in Independent's recommendation for addressing the floor damage, reflects the parties' expectation that otherwise acceptable concrete slabs will emit moisture at levels exceeding that which is acceptable for direct application of VCT flooring.

Accordingly, because it cannot point to a single contributory act or omission by Bel Air, Ross retains responsibility under the lease for the VCT flooring. For the same reasons, Ross's counterclaim for breach of contract, including any assertion that Bel Air has an obligation to replace or repair the concrete slabs, cannot survive Bel Air's motion for summary judgment.[4]

### b. *Ross's Additional Arguments Against Summary Judgment*[5]

Ross claims the parties have a genuine dispute over whether Ross's contractor was required, and failed, to test the concrete slabs' moisture emissions prior to installing the VCT flooring. While there may be a genuine dispute over the testing requirement, that dispute is not over a material fact. With no evidence that an act or omission attributable to Bel Air caused the damage, whether Ross's contractor erred by not measuring the moisture levels is irrelevant. As the testing requirement does not "affect the outcome of the suit," it is not a material fact, and the court need not consider it in ruling on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[4] Additionally, even if Bel Air did contribute to the moisture damage, the records suggest Ross also caused the damage, which would absolve Bel Air from liability under the lease. Ross's own expert, Independent, "observed what appeared to be patching compounds and adhesive residues from previous installations" at every testing site. (IFTI Investigation Report 3, ECF No. 13-9). The construction plans instructed Ross's contractor to "follow [the] Azrock installation manual," which required the removal of "adhesive residues," when installing the VCT flooring. (Construction Plans, ECF No. 13-7). Additional documents suggest the removal of adhesives was also a prerequisite to installation of the CS2000 system, the absence of which would expose the VCT flooring to impermissibly high levels of moisture. (Reply Mem. Supp. Mot. Summ. J., Ex. D, CS2000 2-Day System Installation Directions, ECF No. 27-5; Reply Mem. Supp. Mot. Extend Dispositive Mots. Deadline, Ex. A, Creteseal 2 Day System Technical Data Sheet, ECF No 29-1 at 5). The admissibility of these documents remains disputed, and the court does not base its holding on this analysis. It is sufficient that Ross has not identified an act or omission attributable to Bel Air that caused the VCT flooring damage.

[5] Ross also requested additional discovery in its opposition to Bel Air's motion for summary judgment. Having already addressed the issue, (Order, ECF No. 30; Order, ECF No. 33), the court need not consider it further.

Ross also alleges "material factual issues remain regarding the actual cause of the damage to the Store." (Opp'n Mot. Summ. J. 13, ECF No. 19).  Notwithstanding the pre-litigation exchanges between the parties, both Ross and Bel Air's experts acknowledge the VCT flooring damage is the result of moisture emissions from the concrete slabs.  (IFTI Investigation Report 1, ECF No. 13-9; George Donnelly Report 1, ECF No. 13-10).  Accordingly, there is no genuine dispute over the cause of the damage.[6]  As explained above, however, Independent's report does not establish that the slab was not in good or sightly condition consistent with other shopping centers of similar age in the Baltimore area.

Additionally, Ross contends Bel Air consented by "negative implication" to Ross's contractor's work under section 12.1.1 of the lease, including any faulty installation of the CS2000 system.  (Opp'n Mot. Summ. J. 10, ECF No. 19).  Section 12.1.1 requires Ross to obtain Bel Air's approval for alterations to those "element[s] of the Store that [Bel Air] is required to maintain under Section 11.2.1, including the foundation, roof, or any structural portions of the Store." (Lease 45, ECF No. 13-3).  As discussed above, Bel Air was not required to maintain the flooring under section 11.2.1 of the lease.  Even if Bel Air had approved Ross's contractor's work, that would simply show that Ross's agent contributed to the damage of the VCT flooring, which would vitiate any liability Bel Air may have under the lease.

Ross also argues the court cannot rule for Bel Air because Bel Air refused to mediate in violation of section 20.2.2 of the lease. (Opp'n Mot. Summ. J. 18, ECF No. 19).  This provision clearly states "either party" has the option to bring "suit or action in court" when one party "fails to participate in Mediation." (Lease 56–57, ECF No. 13-3).  Accordingly, the lease does not preclude Bel Air from bringing this suit.

---

[6] As noted, Bel Air also contends that improper installation of the flooring caused the damage.  Bel Air is likely correct, but that fact is not relied on in this ruling.

### III.   Attorneys' Fees

The lease provides, in the event of litigation between the two parties, "the prevailing party shall be entitled to have and recover from the losing party reasonable attorneys' fees, costs of suit, investigation costs, expert witness costs (whether testifying as an expert or fact witness), and discovery costs, including costs of appeal." (Lease 58 § 20.4.2, ECF No. 13-3).  "Contract provisions providing for awards of attorney's fees to the prevailing party in litigation under the contract generally are valid and enforceable in Maryland." *Myers v. Kayhoe*, 391 Md. 188, 207 (2006).  Here, Bel Air is the prevailing party entitled to some level of attorneys' fees and costs.  "The burden is on the party seeking recovery to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees." *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 316 (2004) (citation omitted).  Bel Air must provide "detailed records" that specify "the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged." *Rauch v. McCall*, 134 Md. App. 624, 639 (2000) (citation omitted); *see also* Local R., App. B: Rules and Guidelines for Determining Attorneys' Fees in Certain Cases (D. Md. 2014).  The court will entertain a properly timed and substantiated motion for attorneys' fees and costs.[7]

### CONCLUSION

Ross is responsible for repairing the damage to the VCT flooring and paying all related costs.  Additionally, Bel Air does not have an obligation under the lease to remediate the ongoing moisture emissions from the concrete slabs.  Bel Air's motion for summary judgment will be granted.

---

[7] The parties should attempt to agree upon a reasonable amount of fees and costs, but if they cannot do so, the court will make that determination.

A separate order follows.

March 22, 2016                                                   /S/
Date                                                             Catherine C. Blake
                                                                 United States District Judge